# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LORI ROTH, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16-410 |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | |
| CITY OF HERMITAGE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM ORDER**

### I. MEMORANDUM

Pending before the Court are Motions to Dismiss (**Docs. 16 & 20**), filed by Defendants pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, Defendants' Motions to Dismiss (**Docs. 16 & 20**) will be GRANTED.

### A. Factual Background[1]

In her Amended Complaint, Plaintiff Lori Roth alleges that the Defendant City of Hermitage and several individuals — including several Hermitage police chiefs, detectives and police officers, and the Mercer County Coroner — violated her federal constitutional right of access to the courts and conspired among themselves to commit this constitutional violation by inadequately investigating the June 22, 2014 death of Plaintiff's son, Evan Roth.

The facts alleged in the Amended Complaint related to Defendants the City of Hermitage

---

[1] The following background facts are taken from Plaintiff's Amended Complaint (Doc. 10). Because the case is presently before this Court on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court accepts as true all allegations in the Complaint and all reasonable inferences that can be drawn therefrom. See Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989). In addition, the Court views all well pled factual averments and reasonable inferences in the light most favorable to the non-moving party. Id.

and individual law enforcement officials employed by the City of Hermitage (the "City Defendants"), are as follows:

On June 22, 2014, at approximately 10:57 a.m., a 911 call was placed from the residence located at 269 Butterfly Lane, Hermitage, Pennsylvania 16148, indicating that a male individual, later determined to be Evan Roth, was found in the swimming pool, floating face down, non-responsive. Doc. 10, ¶ 19. The caller gave no indication as to when, how, and by whom the body was discovered in the pool. Id. Upon making the 911 call, dispatch instructed individuals at the residence to remove the body of the decedent from the pool, and to place him on his back along the side of the pool. Id. ¶ 20. Upon the receipt of the call to 911 Dispatch, 911 personnel immediately directed police officers of the City of Hermitage Police Department and an EMS Unit to proceed to 269 Butterfly Lane, Hermitage, Pennsylvania 16148. Id. ¶ 21. The dispatch was made at 10:58 a.m., with police officers arriving at the residence four minutes later at 11:02 a.m. Id.

According to Plaintiff, at some point prior to the arrival of the dispatched Hermitage Police, Detective Piatek was summoned to the scene by his son, Adam, who was among the individuals present at the home where Evan Roth died. Id. ¶ 22. Plaintiff alleges that Detective Piatek was previously employed by the City of Hermitage Police for thirty-two years prior to his retirement in May of 2010 and, at the time of the incident in question, was employed by Mercer County District Attorney's Office as a Detective in its investigations branch. Id. Plaintiff speculates that "Detective Piatek was present before investigators in an effort to safeguard his son and his son's friends from any culpability regarding the decedent's death." Id. ¶ 32. Plaintiff alleges that "although investigators knew that Detective Piatek was present at the scene prior to their arrival, he was never interviewed by the City of Hermitage Police." Id. ¶ 31.

Plaintiff states that the police's failure to interview Detective Piatek "is particularly troubling in light of the fact that not only was he formally employed by the same investigatory entity that was tasked with investigating the death of the decedent, but his current employer – the Mercer County District Attorney's Office – would obviously by [sic] the entity who would make the determination whether to charge an individual or individuals who were present at the scene, one of those individuals being Detective Piatek's son." Id. Plaintiff claims that "in light of his presence and the obvious bias that existed, a neutral investigative agency, such as the Pennsylvania State Police, should have been summoned," but that "[n]o such agency was summoned." Id. ¶ 32.

When law enforcement arrived at the scene, they found the body of the decedent lying on his back, his skin blue, and without a pulse. Id. ¶ 24. Plaintiff alleges that "it was never determined what the appearance of the decedent's body looked like prior to being moved . . . . ." Id. Furthermore, according to Plaintiff, when officers arrived at the scene, they heard the sound of aluminum or glass cans clanging together. Id. ¶ 23. Plaintiff alleges that investigators "determined that this was the sound of the individuals present at the residence finishing their clean-up of the scene" and that police described the clean up as "significant, with at least three full garbage bags and a plastic recycling can full of bottles, cans, and other debris." Id. Nevertheless, "[d]espite the fact that at least one police officer, Detective Miller, was suspicious as to why the scene was cleaned prior to the 911 call, there was no indication made that either he or any of the officers determined precisely when the clean up occurred, nor was there any inspection made of the garbage that was collected by the individuals in an effort to recover any evidence concerning the death of Evan Roth." Id. ¶ 30.

Upon their arrival, the investigating officers learned that Matthew Ceremuga, who

resided at the subject residence with his parents, had held a party at his residence on June 21, 2014, with people coming and going throughout the day and into the early morning hours of June 22, 2014. Id. ¶¶ 25-26. Plaintiff alleges that witnesses estimated that between fifteen and twenty people were present at the party at various times. Id. Plaintiff alleges that law enforcement did not make an effort to identify "all individuals who were present during the time period precipitating the death of Evan Roth." Id. Specifically, Plaintiff claims that, while Ceremuga had texted invitations to a number of people inviting them to the party, the investigating officers made no effort to preserve and/or recover the subject text messages sent by Ceremuga, or any responses he received. Id.

Plaintiff further contends that there were "multiple inconsistencies in the statements and information obtained regarding the manner in which Evan Roth died; the cause of his death; when his death occurred; and whether or not the same resulted from foul play." Id. ¶ 40. As to the cause of death, Plaintiff alleges that Defendant Detective Miller "suggested" two possible alternatives, both of which Plaintiff claims are "problematic." Id. ¶¶ 34-37. First, Detective Miller suggested that Evan Roth could have died after jumping into a kayak in the pool, falling, and then hitting his head. Id. ¶¶ 32-34. Plaintiff alleges, however, that "no forensic inspection was made of the kayak concerning its possible involvement with the death of the decedent." Id. ¶ 33. Furthermore, according to Plaintiff, this hypothesis "directly contradicts the witness statements that all agreed that Evan Roth was alive after attempting to jump on the floating object." Id. ¶ 35. Plaintiff further claims that, although police learned during the investigation that one of the guests at the party, Tim Lenzi, took a video of Evan Roth jumping into a kayak, that video "was not preserved and had been subsequently deleted by [Lenzi]." Id. ¶ 29. Alternatively, Plaintiff claims that Detective Miller "offered that Evan Roth dove into the pool

striking the right side of his head and causing the fracture to the cervical region of the spine." Id. ¶ 37. Plaintiff claims that "such an alternative is problematic, as the same does not address the injury to the back of the head suffered by Evan Roth." Id. Furthermore, Plaintiff asserts that police never investigated "the depth of the pool and the materials it was constructed of." Id.

As to the time of death, Plaintiff alleges that, "despite law enforcement's interview of at least five individuals who were at the residence, no one was able to determine what time Evan arrived" or "when Evan Roth was last seen alive at the residence." Id. ¶ 28. Plaintiff claims that "[a]ll individuals present during this time period, with the exception of Ceremuga and his girlfriend, were up playing drinking games, specifically flip cup, until 5:00 a.m. on the morning of June 22, 2014." Id. Plaintiff states that, while "[a]ll allege that they were unable to view the pool from the location of where they played the game. . . , no diagrams were constructed by investigators to confirm or deny this assertion." Id. Plaintiff also believes that the timeline suggested by Detective Miller that Evan Roth died sometime between 2:00 a.m. and 7:00 a.m. "directly contradicts" the timeline provided by other individuals who saw Evan alive as late at 3:00 a.m. Id. ¶ 38.

Plaintiff alleges that, following his death, several of Evan Roth's friends visited the family. Plaintiff claims that, during the visit, the family overheard "one male tell the others do not talk to anyone about what happened." Id. ¶ 39. Plaintiff claims that, while the family told investigators what they had heard, police never investigated and "readily discounted [the statement] without any explanation." Id.

Plaintiff makes the following allegations about Defendant J. Bradley McGonigle:

At the time of the incident, McGonigle was the Mercer County Coroner and Medical Examiner. Id. ¶ 43. According to Plaintiff, the County Coroner is "obligated to view the body

5

of the deceased and investigate the facts and circumstances concerning deaths which have occurred within the county for the purpose of determining whether or not an autopsy should be conducted or an inquest thereof should be had." Id. ¶ 44. Plaintiff states that an autopsy is generally performed in the following cases: "(1) sudden deaths not caused by readily recognizable disease, or where the cause of death cannot be properly certified by a physician; (2) deaths occurring under suspicious circumstances, including those where alcohol, drugs, or other toxic substances may have a direct bearing on the outcome; or (3) deaths occurring as a result of violence or trauma, whether apparently homicidal, suicidal, or accidental." Id. According to Plaintiff, "[i]f the coroner is unable to determine the cause and manner of death following the autopsy, or if questions arise concerning inconsistencies in information received concerning the death of an individual, an inquest must be undertaken, as provided by law. At the inquest, the coroner's duty shall be to ascertain the cause of death, to determine and identify whether any person other than the deceased was responsible either by criminal act or neglect, and to examine any further evidence and witnessing regarding the cause of death." Id.

In this case, an autopsy was performed on June 23, 2014 at 12:00 p.m. by Dr. Eric Vey. Id. ¶ 43. In his report, Dr. Vey made an anatomic diagnosis of "Blunt Force Trauma to the Head and Neck," indicating the existence of a right medial partietal subgaleal hemorage; a laceration to the left side of the tongue; and a comminuted compression fracture of the 5th cervical vertebra. The pathologic findings were said to be consistent with drowning. Id. Dr. Vey opined that Evan Roth sustained a neck fracture followed by drowning in a "swimming pool mishap." Id. Plaintiff claims that, following Dr. Vey's autopsy, Defendant McGonigle did not conduct an "inquest," despite the fact that Dr. Vey did not determine "how the swimming mishap occurred or a time frame within which the death occurred." Id. Plaintiff alleges that "[i]t is believed and

6

therefore averred that [] McGonigle did discuss the death of Evan Roth with the investigating officers, yet, took no action to resolve the inconsistent statements of witnesses regarding the death of Evan Roth, which could have been caused by one or more individuals." Id. ¶ 46.

**B. Procedural Background**

Plaintiff filed this lawsuit on April 7, 2016. (Doc. 1). The City Defendants filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) on May 5, 2016. (Doc. 5). Plaintiff filed the First Amended Complaint – currently the operative pleading – on May 24, 2016. (Doc. 10). In her Amended Complaint, Plaintiff claims that Defendants violated her federal constitutional right of access to the courts, and that these same Defendants conspired among themselves to commit this constitutional violation. (Doc. 10, ¶¶ 49-71). Specifically, Plaintiff claims that, in light of Defendants' allegedly inadequate investigation, she has been deprived of the opportunity to seek meaningful judicial redress for her son's death in the form of a state-court wrongful death action.

On June 21, 2016, the City Defendants filed the instant Motion to Dismiss. (Doc. 16). In their Motion, the City Defendants argue that Plaintiff cannot show that she has been deprived of the opportunity to bring a wrongful death action on behalf of her son, when, in fact, she already has successfully litigated one wrongful death action in state court, and is in the process of litigating a second. Specifically, the City Defendants offer evidence that Plaintiff filed a lawsuit against Greg, Lori, and Matthew Ceremuga in the Court of Common Pleas of Mercer County, Pennsylvania at Docket No. 2015-01138 on April 15, 2015. (Doc. 17-2). Plaintiff settled that lawsuit for the sum of $101,000, which was approved by the state court judge on March 8, 2016.

7

(See Doc. 17-5).[2]  After settling that first action, Plaintiff filed a second wrongful death action on July 21, 2016, naming twenty-one individual defendants who were identified by law enforcement as being present at the Ceremuga residence on the night that Evan Roth died.  (See Doc. 17-10).   The Writ of Summons in the second lawsuit was issued on June 21, 2016.  Id.

On June 28, 2016, Defendant McGonigle filed his Motion to the Dismiss the Amended Complaint pursuant to Rule 12(b)(6).  (Doc. 20).  Like the City Defendants, Defendant McGonigle argues that Plaintiff's denial of access to the courts claim should be dismissed because "the investigation performed by the City of Hermitage Police Officers and/or Defendant McGonigle. . . has assisted the Plaintiff in pursuing her wrongful death and survival actions against the potentially responsible parties." (Doc. 21 at 17).  Defendant McGonigle also argues that Plaintiff's conspiracy claim should be dismissed because she had "not set forth any specific factual basis" to support the claim.  Id. at 15.

For the reasons set forth below, the Court will grant Defendants' Motions to Dismiss.

## C. Legal Analysis

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp.  v. Twombly, 550 U.S. 544, 570 (2007)).  When faced with a motion to dismiss, a court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions."  Fowler v. UPMC Shadyside, 578 F.3d

---

[2] The Court notes that, despite the fact that Plaintiff filed the instant lawsuit after settling her state court action against the Ceremugas, she did not disclose the state court action and settlement in her Complaint.  (See Doc. 1).  Given that the crux of Plaintiff's Complaint was that she was denied access to the courts, the fact that she was able to bring a state court action against the Ceremugas clearly is pertinent, and her omission of this fact from her pleadings is notable.

203, 210-11 (3d Cir. 2009). In deciding a Rule 12(b)(6) motion to dismiss, the Court may consider "the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." Lum v. Bank of Am., 361 F.3d 217, 222 n.3 (3d Cir. 2004).

### 1. Plaintiff Has Not Stated a Cognizable Denial of Access to the Courts Claim

The right to access the courts is a fundamental right that finds support in several provisions of the U.S. Constitution: the Privileges and Immunities Clause of Article IV, the Due Process Clause of the Fourteenth Amendment, and the Petition Clause of the First Amendment. Christopher v. Harbury, 536 U.S. 403, 415 n.12 (2002); Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety, 411 F.3d 427, 441 (3d Cir. 2005). This right "not only protects one's right to physically enter the courthouse halls, but also insures that the access to the courts will be 'adequate, effective, and meaningful.'" Swekel v. River Rouge, 119 F.3d 1259, 1262 (6th Cir. 1997); see Ryland v. Shapiro, 708 F.2d 967, 972 (5th Cir. 1983).

The Court of Appeals for the Third Circuit has recognized that "[c]over-ups that prevent a person who has been wronged from vindicating his rights violate the right of access to the courts." Estate of Smith v. Marasco, 318 F.3d 497, 511 (3d Cir. 2003) (citations omitted). The Court explained:

> [I]f state officials wrongfully and intentionally conceal information crucial to a person's ability to obtain redress through the courts, and do so for the purpose of frustrating that right, and that concealment and the delay engendered by it substantially reduce the likelihood of one's obtaining the relief to which one is otherwise entitled, they may have committed a constitutional violation.

Id. (quoting Swekel, 119 F.3d at 1262-63); accord Foster v. City of Lake Jackson, 28 F.3d 425, 430 (5th Cir. 1994) (right of access violated by "an officially-created impediment to the ability to file an action").

9

The Third Circuit has noted that, "[n]otwithstanding the broad formulation of the principle that a state officer's cover-up may create constitutional liability, in practice the courts have been cautious in allowing liability to be imposed on that basis." Marasco, 318 F.3d at 511. Specifically, the Third Circuit held that "only prefiling conduct that either prevents a plaintiff from filing suit or renders the plaintiff's access to the court ineffective or meaningless constitutes a constitutional violation." Id. at 511-12 (finding that even if the plaintiffs could prove a cover-up, their claim could not survive because they had "not made a showing that the defendants' efforts either prevented [them] from filing suit or rendered their access to the courts ineffective or meaningless," and explaining that the "very opinion" it was rendering demonstrated that the plaintiffs had been able to develop the facts in the case quite effectively); see also Gibson, 411 F.3d 427 (denial of constitutional right of judicial access requires showing state officials intentionally concealed information crucial to the plaintiff's ability to obtain judicial redress and did so for purposing of frustrating right of judicial access, and that the concealment substantially reduced likelihood of obtaining judicial relief).

Here, Plaintiff's denial of access to the courts claim, as currently pled, does not survive a motion to dismiss. Although Plaintiff alleges that Defendants failed to properly investigate her son's death, she does not allege the type of "cover-up" required to state a viable denial of access to the courts claim. Plaintiff relies in her briefing on an opinion from the Court of Appeals for the Fifth Circuit, Ryland v. Shapiro, 708 F.2d 967 (5th Cir. 1983). (See Doc. 24 at 10). In Ryland, plaintiffs alleged that their daughter had been murdered by a state prosecutor, but that he and a fellow prosecutor, by falsification of documents, subornation of perjury, and other gross improprieties, caused the death to be reported as a suicide, with the result that plaintiffs did not learn of facts which would have justified a wrongful death action until the statute of limitations

for such an action had expired. Id. at 967. The Court of Appeals concluded that these allegations could establish a violation of the constitutional right of access to the courts, and an award of at least nominal damages and attorneys' fees. Id.

The allegations in this case are readily distinguishable from those in Ryland. Even taking her allegations as true, Plaintiff—at best—has alleged that Defendants conducted an "inadequate investigation" into the circumstances surrounding her son's death. (See Doc. 24 at 11 ("[I]n her Amended Complaint, [Plaintiff] has alleged the variety of specific deficiencies that existed in the inadequate investigation that acted as a roadblock to pursue legal redress in the way of filing a Wrongful Death/Survival Action related to her son's death")). Unlike in Ryland, Plaintiff does not allege facts showing that Defendants engaged in any active concealment or falsification of evidence. Contrast with Bell v. City of Milwaukee, 746 F.2d 1205 (7th Cir. 1984) (massive cover-up and falsification to conceal police responsibility for an unjustified homicide supported an award of damages for violating heirs' constitutional right of access to the courts); Swekel, 119 F.3d at 1264 ("Swekel alleges that the police covered-up proof against one of their own, destroyed critical evidence, and delayed Swekel's own investigation. These allegations, if true, would substantially prejudice Swekel's ability to recover in state court."). Although Plaintiff claims that "key evidence was destroyed," she does not assert that Defendants themselves concealed or destroyed any evidence. (Doc. 24 at 12). Rather, Plaintiff merely contends that Defendants failed to secure evidence that allegedly was destroyed by third parties, including text messages from Matthew Ceremuga's cell phone, a video taken of her son by Tim Lenzi, and trash allegedly disposed of by a non-party to this lawsuit prior to police arriving at the scene. Doc. 24 at 11-12.

Furthermore, Plaintiff does not allege that Defendants' actions have rendered her access

to the court ineffective or meaningless. See Marasco, 318 F.3d at 511. Plaintiff makes the conclusory statement that "her ability to commence a wrongful death action has forever been precluded by the Defendants' acts, under color of state law, in destroying evidence and deliberately failing to conduct an appropriate investigation, including properly identifying and interviewing all individuals who were present at the scene, into Evan Roth's death." (Doc. 26, at 16). However, as Defendants argue, Plaintiff does not allege that Defendants' actions prevented her from bringing timely wrongful death actions in state court. See Naluan v. Purfield, 2006 WL 3208771, at *4 (E.D. Pa. Nov. 2, 2006) ("[Plaintiff] has not shown that his right to access the courts has been made ineffective or meaningless by the delay in bringing suit caused by defendants' conduct. In fact, [plaintiff] was able to file suit within less than two months from the night of his apprehension."); Paige v. Police Dep't of the City of Schenectady, 264 F.3d 197, 199–200 (2d Cir.2001) (finding that, despite a police cover-up, the plaintiff had enough information to bring an assault claim before the statute of limitations expired); cf. Ryland, 708 F.2d at 974-75 (suggesting that a viable denial of access claim may exist where "the defendants successfully covered up [the plaintiffs' daughter's] murder for a period of eleven months," which "prevented [the plaintiffs] from discovering that their daughter had been murdered" and delayed their ability to bring a wrongful death action).[3] Indeed, Plaintiff has, in fact, "commenced" two wrongful death lawsuits, belying the notion that "her ability to commence a wrongful death action has forever been precluded."

---

[3] Additionally, although Plaintiff claims that Defendants' actions prevented her from identifying those who might have been responsible for her son's death, she was able to bring suit against both the Ceremuga family as well as twenty-one individual defendants identified by police during their investigation. See Cooper v. City of Chester, 2011 WL 6046934, at *6-7 (E.D. Pa. Dec. 5, 2011) (dismissing a denial of access claim based on allegations that police officers covered up an unjustified use of deadly force against the plaintiff because the plaintiff was "able to identify the defendants and develop the facts of [his] claim in a timely Complaint").

12

Nor does Plaintiff allege that she has been prevented from meaningfully prosecuting her two wrongful death actions. As noted, Plaintiff was able to recover $101,000 from the Ceremuga family, and there is no indication that she would have received a higher settlement amount in the absence of Defendants' alleged conduct. Furthermore, to the extent that Plaintiff claims that she cannot meaningfully litigate her pending state court action, that claim is premature. As other courts have recognized, when a wrongful death action remains pending in court, it is "impossible" to determine whether a defendant's actions have prevented a plaintiff from meaningfully accessing the courts. See Delew v. Wagner, 143 F.3d 1219, 1223 (9th Cir. 1998) (dismissing without prejudice a § 1983 action against police officers who allegedly covered up evidence to protect the wife of another police officer who killed a bicyclist in a traffic accident, where the victim's family brought a wrongful death action in state court against the driver, reasoning that, absent the final disposition of the state court suit, the court could not determine whether "the defendants' cover-up violated [the plaintiffs'] right of access to the courts by rendering any available state court remedy ineffective."); Karim–Panahi v. Los Angeles Police Department, 839 F.2d 621, 625 (9th Cir. 1988) (ordering the dismissal without prejudice of a denial-of-access claim, where the plaintiff's "cover-up allegations would be mooted" if he were to succeed in his underlying claims that remained pending); Flagg v City of Detroit, 447 F. Supp. 2d 824 (E.D. Mich. 2006). Thus, until Plaintiff's pending state court action has been resolved, the Court cannot determine whether Defendants' conduct has rendered her access to the courts ineffective or meaningless.[4] See Swekel, 119 F.3d at 1264 ("[A] plaintiff

---

[4] Plaintiff argues that "the fact that the Plaintiff's [sic] filed a Writ does not negate her ability to purse a right of access claim." Plaintiff cites to Singer v. Wadman, 595 F. Supp 188 (D. Utah 1982) aff'd 745 F.2d 606 (10th Cir. 1984), and contends that "in Singer, the action as to which the right of access was allegedly to have been denied had been filed and was actually proceeding

13

cannot merely guess that a state court remedy will be ineffective because of a defendant's actions.").

For the reasons stated above, the Court will dismiss Plaintiff's denial of access to the courts claim, without prejudice. Given the Court's conclusion that this claim is premature, the Court also will stay this action pending the resolution of Plaintiff's state court action.

### 2. **Plaintiff's Civil Conspiracy Claim Will Be Dismissed**

Having dismissed the underlying denial of access to the courts claim against Defendants for failure to state a cause of action, the Court likewise will dismiss Plaintiff's claim for civil conspiracy to commit this constitutional violation, without prejudice. See Samuel v. Clark, 1996 WL 448229, at *4 (E.D. Pa. Aug. 7, 1996) (dismissing conspiracy claim where underlying claims for fraud and discrimination were dismissed); Potter v. Hoffman, 1998 WL 826896, at *3 (E.D. Pa. Nov. 24, 1998) (there is no liability for civil conspiracy unless there is liability for the act or acts underlying the conspiracy); Rose v.Wissinger, 294 Pa. Super. 265, 439 A.2d 1193, 1199 (1982) (dismissing conspiracy claim where defamation and outrageous conduct claims were dismissed).

### 3. **Deficiencies in Plaintiff's Claims Against Specific Defendants**

For the reasons stated above, the Court finds that Plaintiff has failed to state a claim for relief against any of the named Defendants. For the sake of completeness, however, the Court also will address deficiencies in Plaintiff's Amended Complaint as they relate to specific

---

through the court system and it was still found that the plaintiffs had been denied access to judicial remedies." The court in Singer did not make such a finding. To the contrary, in Singer, the court granted summary judgment to defendant on the plaintiff's denial of access to the courts claim, finding that, in order to state a claim for relief, "the conduct would have to be both deliberate and so egregious as to make a plaintiff's access to the courts virtually meaningless," and that the facts in that case did not demonstrate that the "plaintiff's due process right has been deprived." Id. at 302.

Defendants.

### i. Plaintiff's Claims Against the City of Hermitage

A "local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." Monell v. Dep't of Soc. Serv., 436 U.S. 658, 694 (1978). In order to state a claim of municipal liability under § 1983, a plaintiff must allege that he or she was subject to a constitutional violation as the result of some identifiable official custom or policy of a municipality. Faylor v. Szupper, 411 F. App'x 525, 530-31 (3d Cir. 2011) (citing Montgomery v. De Simone, 159 F.3d 120, 126 (3d Cir. 1998)). In addition, a plaintiff must establish that the municipality was the moving force behind her alleged injury. Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 405 (1997). This means that the "plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Id. (citations omitted).

Here, Plaintiff does not allege that the City of Hermitage has any official policies or customs in place that resulted in a cover-up or other constitutional violation. As such, Plaintiff's municipal liability claims will be dismissed. As it is unclear whether leave to amend would be futile, dismissal of these claims will be without prejudice.

### ii. Plaintiff's Official Capacity Claims Against the Individual City Defendants

It is well established that a claim against an individual official in his or her official capacity is the equivalent of a claim against the municipality. Kentucky v. Graham, 473 U.S. 159, 166 (1985) ("[P]laintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself."); Monell, 436 U.S. at 658 (official-capacity suits "generally represent only another way of pleading an action against the entity of which the

officer is an agent."); Brice v. City of York, 528 F. Supp. 2d 504, 516 n. 19 (M.D.Pa.2007) (claims against state officials in their official capacities merge as a matter of law with the municipality that employs them).

It follows, therefore, that Plaintiff's claims against the individual City Defendants named in their official capacities are duplicative of her claims against the City of Hermitage itself. Thus, the Court exercises its discretion to dismiss these duplicative and unnecessary official capacity claims. Burton v. City of Philadelphia, 121 F. Supp. 2d 810 (E.D. Pa. 2000) (because claims against individual defendants in their official capacities are equivalent to claims against the governmental entity itself, they are redundant and may be dismissed). This dismissal is with prejudice because amendment would be futile as any official capacity claim for damages under § 1983 is duplicative of Plaintiff's Monell claim.

### iii. Plaintiff's Individual Capacity Claims Against Defendants Blair, Jewell and Piccirillo

A defendant in a § 1983 action must have personal involvement in the alleged wrongs. Robinson v. City of Pittsburgh, 120 F.3d 1286, 1294 (3d Cir. 1997) (citing Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)); Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 & n.3 (3d Cir. 1995) (holding that there is no supervisory liability under § 1983 absent evidence of, *inter alia*, knowledge of or acquiescence in, subordinates' violation of a plaintiff's rights). As the City Defendants argue, there are no allegations in the Amended Complaint that Defendants Blair, Jewell and Piccirillo were personally involved in any of the alleged conduct. Thus, the individual capacity claims against these defendants will be dismissed without prejudice.

### iv. Plaintiff's Claims against Defendant McGonigle

The Court will also dismiss all claims against Defendant McGonigle. First, as it did with the individual City Defendants, the Court will construe Plaintiff's official capacity claims against

16

Defendant McGonigle as claims against Mercer County. Because Plaintiff alleges no facts suggesting that Mercer County has an identifiable custom or policy that resulted in the denial of her constitutional rights, her official capacity claims against Defendant McGonigle will be dismissed without prejudice.[5]

Likewise, the Court will dismiss Plaintiff's individual capacity claims against Defendant McGonigle. Plaintiff's sole allegation against Defendant McGonigle is that he "discuss[ed] the death of Evan Roth with the investigating officers, yet, took no action to resolve the inconsistent statements of witnesses regarding the death of Evan Roth." (Doc. 10 at ¶ 46). Plaintiff seems to suggest that, in deciding not to conduct any further investigation, Defendant McGonigle failed to fulfill his duties as a coroner under Pennsylvania law. Id. at ¶¶ 44-45. However, as Defendant McGonigle argues, Pennsylvania law has "clothed [the coroner] with discretionary powers to decide the extent of an investigation and to decide the cause of death." Chadwick v. Dauphin County Office of the Coroner, 905 A.2d 600, 605 (1994) (citation omitted). "The County Code does not require a coroner to convince members of the public, including family members, of the accuracy of his findings." Id. Here, Plaintiff merely alleges that Defendant McGonigle exercised his discretion as the Mercer County Coroner to determine the appropriate scope of the investigation into her son's death. This is not sufficient to state a claim for relief. Once again, there is no allegation that Defendant McGonigle (or any other Defendant) engaged in active concealment or destruction of evidence that could give rise to a viable denial of access to the courts claim.

For these reasons, Plaintiff's claims against Defendant McGonigle will be dismissed

---

[5] The Court notes that Plaintiff has not named Mercer County as a Defendant. Thus, unlike her official capacity claims against the City Defendants, her official capacity claim against Defendant McGonigle is not duplicative, and will be dismissed without prejudice.

17

without prejudice.

## II. ORDER

For the reasons stated above, Defendants' Motions to Dismiss the Amended Complaint (**Docs. 16 & 20**) are GRANTED.

Consistent with the foregoing, Counts I and II of the Amended Complaint **(Doc. 10)** are hereby dismissed without prejudice. Plaintiff's official capacity claims against the individual City Defendants are hereby dismissed with prejudice.

Because, as noted above, the resolution of this case must await resolution of Plaintiff's pending wrongful death action in state court, the Court finds that a stay of this litigation is appropriate. As such, this case is hereby STAYED pending the resolution of Plaintiff's state court wrongful death lawsuit. For the duration of the stay, this case is and shall remain ADMINISTRATIVELY CLOSED. Administrative closings comprise a familiar way in which courts remove cases from their active files without final adjudication, and it does not prejudice the rights of the parties in any manner.

Following the resolution of Plaintiff's pending state court lawsuit, any party may, upon petition or by motion, request that this action be restored to the Court's active calendar. Should the case be reopened, and if appropriate, Plaintiff shall have 14 days from the date the case is reopened to file a Second Amended Complaint. Plaintiff should be aware, however, that absent unforeseen and extraordinary circumstances, no further amendments will be permitted. Although, generally, leave to amend freely is given, this rule cannot be read so broadly as to allow or require the Court and opposing parties to entertain endless requests for amendment. The purpose of Federal Rule 15 is not "to make the complaint 'a moving target,'" Minter v. Prime Equip. Co., 451 F.3d 1196, 1206 (10th Cir. 2006), and any further requests for amendment

likely will raise significant issues regarding undue delay and prejudice.  Accordingly, if Plaintiff chooses to file a Second Amended Complaint, her Second Amended Complaint must make a last, best effort to state any and all allegations and viable claims that Plaintiff intends to pursue in this lawsuit.

       IT IS SO ORDERED.

October 19, 2016                                                          s/Cathy Bissoon
                                                                                    Cathy Bissoon
                                                                                    United States District Judge

CC (via ECF email notification):

All Counsel of Record